# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| HEATHER M. KIRK, | : | Case No. 3:18-cv-00186 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

# DECISION AND ENTRY

---

## I.

Plaintiff Heather M. Kirk has tried to convince the Social Security Administration that she was under a disability and therefore eligible to receive Disability Insurance Benefits. She has not been successful. This is most prominently seen in Administrative Law Judge (ALJ) Elizabeth A. Motta's determination that Plaintiff could still work despite her health problems and that she could perform many jobs that exist in the national economy. These conclusions dictated the final determination that Plaintiff was not under a disability and not eligible to receive Disability Insurance Benefits.

Plaintiff contends that a remand of this case for payment of benefits is warranted due to the ALJ's errors in evaluating (1) her symptoms, and (2) the opinion evidence. Finding no such errors, the Commissioner asks the Court to affirm the ALJ Motta's non-disability decision.

## II.

Plaintiff's ability to work is influenced—like it is for everyone—by her age, education, and work experience. She was 35 years old on her alleged disability onset date (again, January 28, 2015); she has at least a high-school education; and in the past she worked as a medical biller, a medical-records clerk, and a preschool teacher.

### A.    Plaintiff's Health Problems

Plaintiff she has bladder problems and other symptoms related to interstitial cystitis. "Interstitial cystitis … is a condition that causes discomfort or pain in the bladder and a need to urinate frequently or urgently. It is far more common in women that in men. The symptoms vary from person to person. Some people have pain without urgency or frequency. Others have urgency and frequency without pain…." https://medlineplus.gov/interstitialcystitis.html

Plaintiff testified during a hearing before ALJ Motta that her bladder problems—which by then she had endured for about sixteen years—caused her to use the restroom anywhere from five minutes to sixty minutes each day. Her need to use the restroom every five minutes could happen daily—"It's just very sporadic," she said. *Id*. She describes her pain as "debilitating at times." (Doc. #6, *PageID* #83). When she has bladder spasms, she feels pain in her pelvis, bladder, and lower back. *Id*. at 90. She explains, "I cannot get off the couch and even get a glass of water or raise my head or just do anything. It comes with side effects, of course, so I've dealt with IBS [Irritable Bowel Syndrome]—which when you're out in public that comes on it's pretty scary." *Id*. at 83. Her IBS symptoms include abdominal cramping, constipation with diarrhea, and nausea.

Plaintiff's bladder-related pain can flare up, and these flare-ups can last from a day to a month. *Id*. at 90. At the time of the ALJ's hearing, she was experiencing these pain flare-ups about once every week. *Id*.

Plaintiff had surgery for interstitial cystitis approximately three years before the ALJ's hearing in March 2014—approximately ten months before her asserted disability onset date. Plaintiff testified that the surgery involved stretching her bladder. It did not help alleviate her symptoms. She takes medication to treat interstitial cystitis, but it does not help. She wears an adult diaper. At some point, she also underwent a total hysterectomy and is consequently on hormone therapy.

Plaintiff has experienced anxiety for many years. She treats it with medication. Many years (about fifteen) before the ALJ's hearing she received professional mental-health treatment. The level of her anxiety "is very high." *Id*. at 87. She told ALJ Motta, "I'm scared to go anywhere, not knowing where the restrooms are. I'm scared that people will look at me if I go to the restroom more than once in five minutes." *Id*. Plaintiff has panic attacks and extreme agitation. She has difficulty concentrating. She tries "at all costs" not to go out in public. *Id*. at 89.

Plaintiff worked for Amerimed Inc. from 2012 to 2014. *Id*. at 189-90. When this job was eliminated, her employer asked her to stay and work in customer service on the phones and "waiting on patients when they come in." *Id*. at 81. She concluded that she could not do this job. She testified, "I declined because I—just using the restroom as much as I do I could not do that, so I just went ahead and left …." *Id*. She then took a job in billing in a pulmonologist's office. *Id*. at 81. But she left this job in January 2015

because "[t]he stress and the work load was unbelievable and also I would get stuck on the phone with insurance companies for up to three hours on hold." *Id.* This made it very difficult for her to get up and walk away. *Id.*

Plaintiff does some household chores: laundry, cooking, light cleaning. She explained, however, that her ability to do these things is limited:

> I do not do them on a day to day basis and I take frequent restroom breaks when I'm cooking. Sometimes I have to sit down and rest. When I'm folding laundry I can do that at my own pace, sitting on the couch, watching TV. Sometimes I even have to stop while I'm doing laundry and take a nap.

*Id.* at 88.

Plaintiff has fatigue that she thinks is related to her bladder problem. She also does not sleep very well. She usually wakes up four to five times a night to use the restroom. And she believes that some of her medications cause insomnia. *Id.*

Plaintiff goes to the store when her husband can go with her. *Id.* She does not go anywhere on a regular basis. She does not do any work in the yard or garden. She uses an iPad to play games. She watches a lot of television. *Id.* at 85.

Plaintiff does not read books, magazines, or newspapers. She does not help her children with homework. She goes to her daughter's soccer games but is not able to attend all the games because of her bladder problem. *Id.* at 87. She tries to visit her mother once a week. She does not go out with friends.

**B.  Medical Evidence**

The parties have described or referred to the medical evidence in detail, as did the ALJ. Consequently, there is no need to repeat their descriptions but a few highlights will

be helpful.

In November 2013, Plaintiff saw gynecologist William Rush, M.D. for a consultation concerning her interstitial cystitis and related symptoms. Plaintiff asked Dr. Rush for a second opinion. She explained that treatment with multiple medications had not worked. She "gets blurred vision and vertigo." *Id*. at 576; *see id*. at 577. She reported severe urinary frequency—every 5-20 minutes during the daytime; 3-4 times per night. *Id*. Upon examination, Dr. Rush noted, "abdomen is soft without significant tenderness, masses, organolegaly or guarding." *Id*. at 577. He had a lengthy discussion with Plaintiff and her husband about her symptoms, findings, and options. Dr. Rush reviewed all the treatments Plaintiff had had and presented two treatment options: "PMFT vs hydrodistention vs InterStim." *Id*.

In March 2014, Plaintiff underwent a cystoscopy with hydrodistention owing to her "symptomatic pelvic pain, low bladder volume with bladder spasms and suspected interstitial cystitis, failed conservative treatment." *Id*. at 522. During the procedure, it was observed:

> On entry, the bladder appeared to be on smaller side, but a pale normal-appearing dome with squamous metaplasia of the entire trigone and the urethra. It was distended at 80 cm of water to 425 ml. At this point, the flow was stopped and the patient had some spasms forcing the urine output. We drained the bladder, noting blood-tinged urine coming out. On reexamination, no active bleeding but Hunner's ulcerations noted throughout the entire dome and trigone. *This was very consistent with interstitial cystitis/painful bladder syndrome….*

*Id*. at 523 (emphasis added).[1]

While Plaintiff initially did well after surgery, *id*. at 556, her improvement was short-lived.  She told a physician that she had been under stress due to a death in the family and her symptoms had worsened with stress.  *Id*. at 565.

In mid-2014, she agreed to undergo a trial period using InterStim PNE.[2]  *Id*. at 562-63.  Gynecologist William J. Rush, MD surgically implanted an InterStim and the trial went well.  In September 2014, Plaintiff said she was very pleased and reported an 85% reduction in urinary urge incontinence and frequency.  *Id*. at 557.  She strongly desired longer-term InterStim placement.

Dr. Rush surgically implanted a more permanent InterStim in early October 2014.  Two weeks later Plaintiff told Dr. Rush that it was not working as well as it had during the trial period.  *Id*. at 556.  Dr. Rush performed revision surgery involving the InterStim in November 2014.  *Id*. at 663-64.

---

[1]The Interstitial Cystitis Association sheds some light on Hunner's ulcers:

> "Hunner's ulcers"…,  are a subtype of interstitial cystitis (also called IC) and are not ulcers in the usual sense.  They are distinctive areas of inflammation on the bladder wall that characterize the "classic" form of IC.  Hunner's ulcers are the one diagnostic feature that clinches the IC diagnosis, but this "classic" form of IC affects only about 5 to 10 percent of patients. Often, patients with this form of IC have more severe symptoms than patients with nonulcerative IC.

https://www.ichelp.org/about-ic/symptoms-of-ic/hunners-ulcers/

[2]InterStim Peripheral Nerve Evaluation (PNE) "is indicated for the treatment of overactive bladder, including urinary urgency and frequency ….  The device will provide mild pulses of energy to the nerves that control the bladder as you return to your normal activities.  Over the course of the test period, if you show an improvement in symptoms of 50% or greater, you may be a candidate for long-term treatment with InterStim therapy."  http://specializedwomenshealth.com/education/interstim-peripheral-nerve-evaluation-pne/

Yet by January 2015, the InterStim was not helping Plaintiff's urinary symptoms. *Id*. at 553-54. In treatment records, Dr. Rush noted that he had a "lengthy" discussion with Plaintiff "regarding symptoms, findings and options." *Id*. at 554. He then decided upon a course of action: "Will try 3 different [InterStim] programs and see how [patient] does along with impedance [obstruction] check." *Id*. And he assessed Plaintiff as having urge incontinence, nocturia, and urinary frequency. *Id*.

The adjustments to Plaintiff's InterStim did not relieve her symptoms. This remained true through her asserted disability onset date of January 28, 2015. In February 2015, Dr. Rush assessed her with urge incontinence, urinary frequency, and "pelvic pain in female." *Id*. at 551. His examination revealed, "abdomen is soft without significant tenderness, masses, organomegaly,[3] or guarding. Extremities are normal." *Id*. Dr. Rush had another lengthy discussion with Plaintiff about symptoms, findings and options. *Id*. at 551. She continued to report urinary incontinence and pelvic pain during February and March 2015. *Id*. at 546-52. Dr. Rush continued to treat Plaintiff's interstitial colitis through at least September 2016. *Id*. at 700-13.

In May 2015, state-agency physician Teresita Cruz, M.D. examined the administrative record in May 2015. She opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. *Id*. at 109. Dr. Cruz reported that these limitations were due to Plaintiff's interstitial cystitis

---

[3] Organomegaly refers to the "enlargement of visceral organs." *Taber's Cyclopedic Medical Dictionary*, p. 1456 (19th Ed. 2001).

and her resulting "urge incontinence, pelvic pain, and nocturia." *Id*. Dr. Cruz noted that Plaintiff says she has leaking urine with exertion, such as bending. According to Dr. Cruz, Plaintiff had an unlimited ability to climb ramps and stairs, and to kneel and crawl. Id. at 109-10. She could never climb ropes, ladders, or scaffolds, and she could frequently stoop and occasionally crouch. *Id*. at 110. Dr. Cruz briefly explained that Plaintiff had these limitations due to "stress incontinence." *Id*.

In July 2014, Plaintiff's treating physician Kendall J. Erdahl, MD reported that Plaintiff was under his care for interstitial cystitis; she needs to use the restroom every 15 to 60 minutes; she has 1 to 5 doctor appointments per month; and "[s]he gets chronic ulcers in her bladder that are painful, which interrupt her sleep causing fatigue." *Id*. at 619. Dr. Erdahl then expressed his opinion about Plaintiff's disability status, "In my professional opinion, Heather cannot function in a competitive workplace and have gainful employment." *Id*.

In August 2015, Timothy Budnik, D.O. examined the administrative record for the state agency. He formed the same opinions as Dr. Cruz concerning Plaintiff's ability to perform a limited range of light work. He noted, "Interstitial cystitis. Has urge incontinence, pelvic pain, nocturia. [Plaintiff] reports leaking urine with exertion, such as bending. Has GERD and gets heartburn if she misses doses of her meds. GERD is well controlled. Has IBS, endoscopy shows mild gastritis, mild esophagitis, and slight esophageal stricture. No evidence of malnourishment." *Id*. at 127. Dr. Budnik agreed with Dr. Cruz about Plaintiff's postural limitations. *Id*.

In March 2017, Plaintiff's treating physician Kendall J. Erdahl, MD completed a

questionnaire. He reported that he began treating Plaintiff in September 2008 and had treated her continuously ever since. He diagnosed Plaintiff with interstitial cystitis with severe abdominal/bladder pain, fatigue, and frequent painful urination. He believed that these symptoms would frequently interfere with Plaintiff's ability to concentrate. He also thought that Plaintiff could sit for 30 minutes before needing to stand; could stand/walk for 20 minutes at a time before needing to sit; sit a total of 4 hours in an 8-hour workday; and, stand/walk a total of 2 hours in an 8-hour workday. Plaintiff would need to work a job that enabled her to shift positions at will from sitting, standing, or walking.

Plaintiff would need to take unscheduled restroom breaks, according to Dr. Erdahl. During flare-ups, she would need an unscheduled break "every 6-20 minutes." *Id*. at 683. Dr. Erdahl opined that Plaintiff was likely to be absent from work due to her impairments or treatments 4 or more times per month. And he reported that Plaintiff's symptoms were consistent with her medically determinable impairments. *Id*. at 684.

## III.

### A.    Disability Defined

As alluded to above, *supra*, § I, the Social Security Administration provides Disability Insurance Benefits only to individuals who are under a disability and match other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986); *see* 42 U.S.C. § 423(a)(1). Jargon-rich language limits what constitutes a "disability" under the Disability Insurance Benefits program: "The term 'disability' means—inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for

a continuous period of not less than 12 months….” 42 U.S.C. § 423(d)(1)(A); *see Bowen*, 476 U.S. at 470.

**B.      The ALJ's Decision**

ALJ Motta reviewed the evidence and evaluated Plaintiff's disability status under each of the 5 sequential steps set forth in Social Security Regulations.  *See* 20 C.F.R. § 404.1520(a)(4); *see also Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). Her more pertinent findings began at steps 2 and 3 where she concluded that Plaintiff had severe impairments—interstitial cystitis, irritable bowel syndrome, depressive disorder, and anxiety disorder—and that her impairments did not automatically qualify her for benefits.  (Doc. #6, *PageID* #s 54-56).

At step 4, the ALJ concluded that the most Plaintiff could do (her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), consists of light work, which for Plaintiff meant lifting up to 20 pounds occasionally and 10 pounds frequently.  (Doc. #6, *PageID* #56).  The ALJ found her work abilities limited in many other ways.  For example, she opined that Plaintiff could sit, stand, and walk for 6 hours each during an eight-hour workday; occasionally climb stairs or ramps, balance, stoop, kneel, crouch, or crawl; not climb ropes, ladders, or stairs; not have to be replaced by another worker before going to the restroom; could be off task up to 10 percent of the workday beyond normal breaks; limited to simple tasks, low-stress work with no strict-production quotas or fast pace, and only routine work with few changes in the work setting; and, no contact with the public as part of job duties and no teamwork.  *Id*. at 56.  Given these limitations, the ALJ found that Plaintiff could not

perform her past relevant work.

The ALJ concluded at step 5 that there were 362,000 jobs in the national economy that Plaintiff could perform. *Id*. at 69. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a disability and not eligible to receive Disability Insurance Benefits.

## C.    Standards of Review

Review of ALJ Motta's non-disability decision considers whether she applied the correct legal standards and whether substantial evidence supports her findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence is "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation omitted). "Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir.2007) and citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 546–47 (6th Cir. 2004)).

## IV.

## A.    Plaintiff's Symptoms

Plaintiff argues that ALJ Motta failed to properly evaluate Plaintiff's symptoms of frequent urinary urgency, frequent need to use the bathroom, and pain. The ALJ,

according to Plaintiff, ignored evidence that supported her assertions that she could no longer work after January 2015.

The Commissioner contends the ALJ correctly found that the medical evidence did not show a worsening of Plaintiff's symptoms in early 2015 and that the ALJ provided additionally valid reasons for not fully crediting Plaintiff's subjective descriptions of her symptoms.

The Social Security Administration uses a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether an individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. Soc. Sec. R. 16-3p, 2016 WL 1119029, *3 (March 16, 2016); *see Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).[4] Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which the individual's symptoms limit her ability to perform work-related activities. Ruling 16-3p at *4; *see Rogers*, 486 F.3d at 247. When considering the intensity and persistence of the individuals symptoms, ALJs use various factors, including for instance, "the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms...." *Rogers*, 486 F.3d at 247 (citations omitted); *see* Ruling 16-3p (citing

---

[4]The Social Security Administration has clarified that an assessment of an applicant's subjective symptoms is not a credibility determination and "is not an examination of the individual's character." Ruling 16-3p, *1.

factors in 20 C.F.R. § 404.1529(c)(3)).

The ALJ initially found that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms. In this the ALJ was correct. Plaintiff's interstitial cystitis can reasonably be expected to produce her symptoms of urinary urgency and frequency, and pain—to name just a few. No physician, including her gynecologist, found otherwise. *See supra*, § II.

The ALJ next determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms "are not entirely consistent with the medical evidence and other evidence in the record …." (Doc. #6, *PageID* #57). In reaching this conclusion, the ALJ rejected Plaintiff's description and statements about her urinary urgency, her need to use the bathroom frequently (every 5 to 60 minutes), and her pain levels. The ALJ reasoned (1) Plaintiff had worked for well over a decade before her disability onset date; (2) during that time, in 2014, she underwent several procedures to treat her symptoms while continuing to work; (3) the evidence fails to demonstrate a significant worsening in condition; and (4) she testified that she stopped working because her condition prevented her from working unlimited overtime, not from symptoms that caused her to be unable to work.

Each of these reasons collapses under the weight of evidence showing that Plaintiff's interstitial cystitis's symptoms were worsening, and becoming severe, starting in November 2013 (at the latest) when she sought a second opinion from Dr. Rush about her condition, symptoms, and treatment options. Dr. Rush documented that Plaintiff was experiencing severe urinary frequency at this time and that her prior treatments had not

worked.  (Doc. #6, *PageID* #s 575-77).  The fact that she sought a second opinion from Dr. Rush shows that her symptoms were not improving with her previous treatment. Indeed, from November 2013 through 2014 and through her asserted disability onset date in late January 2015, Plaintiff and Dr. Rush searched without success for a treatment that would give her long-term symptom reduction.

The fact, moreover, that Dr. Rush decided to examine Plaintiff's bladder, in March 2014, with a  cystoscopy[5] reasonably suggests that her symptoms were becoming more problematic.  Worsening of her symptoms in 2014 also appears in the results of her March 2014 cystoscopy, during which Dr. Rush found Hunner's ulcerations "throughout the [bladder's] entire dome and trigone. *This was very consistent with interstitial cystitis/painful bladder syndrome*…."  (Doc. #6, *PageID* #523) (emphasis added).  Such objective evidence, and Dr. Rush's medical interpretation of it, confirms Plaintiff's statements regarding the severity of her symptoms.

Additionally, in August 2014 Plaintiff and Dr. Rush were still looking for a treatment to reduce her symptoms.  *See id*. at 492-502.  They opted for an InterStim placement for a trial period.  Plaintiff experienced significant relief during the trial period but later, after Dr. Rush surgically implanted a longer-term InterStim in October 2014, her symptoms returned.  This led Dr. Rush to perform revision surgery involving the InterStim in November 2014.  But this was to no avail.  Her symptoms continued into

---

[5] "Cystoscopy … is a procedure that allows your doctor to examine the lining of your bladder and the tube that carries urine out of your body (urethra)."  https://www.mayoclinic.org/tests-procedures/cystoscopy/about/pac-20393694

January 2015 when she again went to see Dr. Rush because the InterStim was not working for her. *Id*. at 553. In light of the above evidence—and contrasting with the ALJ's finding—there is sufficient evidence to reasonably infer that Plaintiff's interstitial cystitis and related symptoms were worsening during the year before her asserted disability onset date.

In February 2015, Dr. Rush had a lengthy discussion with Plaintiff about her symptoms, findings, and options. He wrote, "[u]rgency and incontinence still a major issue for pt [patient]." *Id*. at 548. Her pain was "still present and more constant." *Id*.

In March 2015, Plaintiff informed Dr. Rush that she was in a lot more pain and had not been able to gain weight (another symptom of interstitial cystitis). She also reported her constant urge to go to the bathroom with no break in between. *Id*. at 550. She tried turning off the InterStim but this did not decrease her pain. *Id*. at 547. Dr. Rush reviewed Plaintiff bladder diary and wrote, "voiding 15-20x/day with multiple leaks (up to 10x/day)." *Id*. at 548. As a result of her worsening symptoms, Plaintiff received several bladder instillations (medicine mixtures directly put into the bladder[6]), but these failed to help. *Id*. at 546.

Further, Dr. Rush's notes contain no indication that he doubted the severity of Plaintiff's descriptions of her interstitial-cystitis symptoms—including her frequent urge to urinate and to use the restroom. Instead, he had repeated, lengthy discussions with Plaintiff about her symptoms, findings, and options, and he attempted over and over

---

[6] *See* https://www.ichelp.org/diagnosis-treatment/treatments/bladder-instillations/

again to reduce the severity of Plaintiff's symptoms with a variety of treatments. *Id.* at 548, 563, 572, 577, 635, 712. Certainly, if Dr. Rush doubted the severity of Plaintiff's symptoms, he would have indicated it somewhere in his records. *Cf. Felisky v. Bowen*, 35 F.3d 1027, 1040 (6th Cir. 1994) ("Surely, if they [physicians] had any doubts about Felisky's credibility, some mention of it would appear in the medical record.").

Turning to Plaintiff's work history, the ALJ mistakenly found significance in her ability to work for ten years preceding her asserted disability onset date and in 2014 when she had several procedures. Plaintiff's ability to work during this period is not reasonably probative of whether she could no longer work in and after late January 2015 due to worsening of her symptoms.

The ALJ also relied on Plaintiff's testimony that she stopped working because her condition prevented her from working unlimited overtime, not from symptoms that stopped her from working. This, however, overlooked Plaintiff's additional testimony. She explained, "I declined [a job offer] because … just using the restroom as much as I did do[,] I could not do that [job], so I just went ahead and left and went to … a job in billing." *Id.* at 81. She then left this job because it was too stressful and "the workload was unbelievable…." *Id.* She was also struggling to perform the job because she needed frequent restroom breaks. Her manager informed her that she was not keeping up with the workflow. *Id.* at 89. By overlooking these aspects of Plaintiff's testimony, the ALJ emphasis on Plaintiff's work abilities in January 2015 was unreasonably circumscribed. And the "substantiality of evidence evaluation does not permit a selective reading of the record." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir.

2013); *see Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.").

Accordingly, Plaintiff's challenges to the ALJ's evaluation of her symptoms of frequent urinary urgency, frequent need to use the bathroom, and pain are well taken.

## B. Medical Opinions

Plaintiff argues that the ALJ failed to evaluate the medical opinions of record as required by 20 C.F.R. § 404.1527 and related case law.

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the medical source's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length,

frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544). These factors also govern the ALJ's review of non-treating medical sources' opinions. *See Gayheart*, 710 F.3d at 376.

The ALJ declined to place controlling or deferential weight on Dr. Erdahl's opinions by finding them "not fully supported by the record." (Doc. #6, *PageID* #62). It was error for the ALJ to mandate full evidentiary support for Dr. Erdahl's opinions. "For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be fully supported by such evidence." Soc. Sec. R. 96-2P, 1996 WL 374188, *2 (July 2, 1996). To the extent the ALJ was addressing the "supportability" factor, it was likewise error to require full evidentiary support. The Regulation describing "supportability" imposes a gradual scale: "The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion...." 20 C.F.R. § 404.1527(c)(3).

The ALJ next placed little weight on Dr. Erdahl because "the determination of disability is a question reserved to the Commissioner, and there is no indication that Dr. Erdahl is qualified to offer an opinion on the claimant's employability...." (Doc. #6, *PageID* #62). The fact that Dr. Erdahl expressed an opinion on the ultimate issue of Plaintiff's disability status, *id.* at 619, is not a valid reason to discount or ignore it or his other opinions about Plaintiff's work limitations, *see id.* at 683-84. "The pertinent

regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.' That's not the same thing as saying that such a statement is improper and therefore to be ignored...." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (internal citation omitted); *see Kalmbach v. Comm'r of Soc. Sec.*, No. 09-2076, 409 Fed. App'x 852, 861 (6th Cir. 2011) ("the fact that the ultimate determination of disability, *per se,* is reserved to the Commissioner, 20 C.F.R. § 404.1527(e), did not supply the ALJ with a legitimate basis to disregard the physicians' [opinions].").

Next, the ALJ erroneously relied on Plaintiff's employment during the years before her disability onset date to discount Dr. Erdahl's opinions. As explained above, *supra*, §IV(A), Dr. Rush's medical records concerning Plaintiff document a worsening of her symptoms near her asserted disability onset date. Dr. Rush's records, moreover, are consistent with Dr. Erdahl's report that Plaintiff had severe abdomen/bladder pain, fatigue, [and] frequent painful urination." *Id*. at 683. Dr. Erdahl had access to the Dr. Rush's medical records concerning Plaintiff as they were routed to him. *Id*. at 549, 555, 564, 566, 578, 703, 707, 712. Thus, Dr. Erdahl's opinions were not based a shallow well of data but were instead informed by Dr. Rush's evaluations and treatment of Plaintiff's interstitial cystitis and related symptoms.

The ALJ also saw no logical reason supporting Dr. Erdahl's opinion that Plaintiff would miss work more than 4 times a month. Yet Dr. Erdahl noted that during Plaintiff's flare-ups, she needs to use the restroom every 6 to 20 minutes. *Id*. It is common sense that Plaintiff could not work a full-time job when she needed to rush to the bathroom this

often.  And Dr. Rush's records—which include his review of Plaintiff's bladder diary—are logically consistent with and support Dr. Erdahl's statement about Plaintiff's frequent need to use the restroom.  *Id*.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors is well taken.

## V.

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041.  The latter is warranted where the evidence of disability is overwhelming or where the evidence of

disability is strong while contrary evidence is lacking.  *Faucher v. Sec'y of Health &*
*Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence
of disability is strong while contrary evidence is lacking.  The strong evidence consists of
Plaintiff's testimony, which is confirmed and supported by Dr. Rush's and Dr. Erdahl's
treatment records, which in turn repeatedly support Dr. Erdahl's opinions about
Plaintiff's need for frequent restroom breaks especially during her flare-ups.  Work
involving stress causes such flare-ups, and the vocational expert testified that no work
exists for someone who needs to take a break every 20 minutes or be off task more than
greater than 15 percent of the workday.  In addition, the vocational expert said that no
work would be available for someone who is absent more than 4 days per month.

Accordingly, a remand for an award of Disability Insurance Benefits is warranted.

**IT IS THEREFORE ORDERED THAT**:

1.  The Commissioner's non-disability finding is vacated;

2.  No finding is made as to whether Plaintiff Heather Kirk was under a
    "disability" within the meaning of the Social Security Act;

3.  This matter is **REMANDED** to the Social Security Administration under
sentence        four of 42 U.S.C. § 405(g) for payment of benefits based on the application
Plaintiff        protectively filed on March 4, 2015; and

4.  The case is terminated on the Court's docket.

February 6, 2020                                  *s/Sharon L. Ovington*
                                                  Sharon L. Ovington
                                                  United States Magistrate Judge